UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 |
| STEIN MART, INC.[1] | Case No. 20-2387 |
| STEIN MART BUYING CORP. | Case No. 20-2388 |
| STEIN MART HOLDING CORP., | Case No. 20-2389 |
| Debtors. | Joint Administration Requested |

## DEBTORS' CHAPTER 11 CASE MANAGEMENT SUMMARY

Stein Mart, Inc. ("SM"), Stein Mart Buying Corp. ("SMB") and Stein Mart Holding

Corp. ("SMHC" and together with SM and SMB, the "Debtors" or the "Company"), as Debtors

and Debtors-in-Possession, submit this Chapter 11 Case Management Summary pursuant to

Local Rule 2081-1(b).

### Introduction

Headquartered in Jacksonville, Florida, the Company is a national specialty off-price

retailer offering designer and name-brand fashion apparel, home décor, accessories and shoes at

discount prices. The Company operates 281 stores, primarily in the Southeast, Texas, Arizona

and California and an Ecommerce retail site. The Company has historically (prior to COVID-19)

employed approximately 9,000 employees (equivalent to approximately 5,000 40-hour

employees).  As of the Petition Date, the Company employed approximately 7,950 employees.

---

[1] The tax identification numbers of the Debtors are as follows: Stein Mart, Inc. 6198; Stein Mart Buying Corp. 1114; and Stein Mart Holding Corp. 0492. The address of the Debtors' principal offices: 1200 Riverplace Blvd., Jacksonville, FL 32207.  The Debtors' claims agent maintains a website, https://cases.stretto.com/SteinMart, which provides copies of the Debtors' first day pleadings and other information related to the case.

The Company filed periodic and annual reports with the Securities and Exchange Commission (SEC) and its common stock is traded on the Nasdaq Capital Market under the symbol "SMRT".

The retail industry has generally experienced difficult business conditions during the past several years. In general, retailers have experience decreased store traffic and have lost market share to fast-growing e-commerce retailers. The declines in store traffic have been especially pertinent for apparel and accessories retailers, such as the Company, which have also experienced lower operating margins as a result. From 2016 through the present, the Company's sales generally declined and the Company faced the difficult task of growing sales while significantly reducing expenses in a difficult retail environment.

In March 2020, the World Health Organization declared the outbreak of the coronavirus ("COVID-19") as a global pandemic, which continues to spread throughout the United States. In response to the COVID-19 pandemic, as of the end of the business day on March 18, 2020, the Company temporarily closed all of its stores and supply chain operations.  The Company started reopening stores in late April, 2020 and its supply chain operations restarted in late May. The Covid-19 pandemic has exacerbated an already difficult retail environment for the Company and has had, and continues to have, a negative impact on the Company's operations and financial results and the Company's revenues, liquidity, results of operations and cash flows, and its ability to pay vendors and landlords according to standard terms, have been materially, adversely impacted.  Following the reopening of the stores, revenues and store customer traffic was initially positive, but were substantially below pre-shutdown levels.  However, during July 2020, the resurgence of COVID-19 cases in the Southeast, Texas, Arizona and California, where the majority of the Company's stores are located, again materially, adversely impacted the Company's revenues, liquidity, results of operations and cash flows. As a result of the second

2

decline in customer traffic and sales resulting from the COVID-19 resurgence, the Company projects insufficient liquidity to continue operating as going concern in the ordinary course of business.

Prior to the COVID-19 pandemic, in January 2020, the Company entered into a merger agreement with Kingswood Capital Management, LLC ("Kingswood") and an entity managed by Jay Stein, Chairman of the Company.  Under the merger agreement, the stockholders of the Company would have received $0.90 in cash for each share of common stock owned. However, on April 16, 2020, the Merger Agreement was terminated prior to closing because the COVID-19 pandemic forced the Company to close all of its stores and the Company was unable to satisfy the minimum liquidity closing condition in the merger agreement. The Company has subsequently engaged in discussions with Kingswood regarding sale of the Company as a going-concern in recent months pursuant to a bankruptcy sale; however, a transaction presently appears unlikely given the COVID-19 resurgence.

The Company believes the immediate liquidation of the Company's assets by a professional liquidation advisor under the supervision of the Bankruptcy Court is the best strategy to maximize value for the benefit of creditors. The Company's current best estimate is that the liquidation of inventory, equipment, fixtures, leases, intellectual property and similar assets will produce a gross recovery in the range of approximately $250 million, which is likely to be sufficient to pay the cost of the liquidation process and Chapter 11 administrative expenses and repay the secured creditors but unlikely to produce any meaningful funds for other creditors. Accurate financial projections are very difficult in the current COVID retail environment.

### 1. Description of Debtors' Business

SM owns all the stock of SMB and SMHC.  The Debtors operate as a single business unit.

4851-1563-1045.12

**Business Strategy**

The Company's business strategy includes:

- Having a desirable, current season assortment of designer, brand-name, exclusive and proprietary fashion apparel, accessories and home decor merchandise,

- Sourcing a wide range of key brands and maintaining strong partnerships with the vendors representing those brands,

- Offering everyday low prices on fashion merchandise through buying methodologies and low-cost operations,

- Attracting repeat and new customers through marketing and advertising programs,

- Having an attractive store appearance, appealing merchandise presentation and on-demand customer service, like a specialty store,

- Maintaining current locations in regional, community and neighborhood shopping centers serving a more affluent customer, and

- Building and growing Ecommerce business.

**Target Customer**

The Company's target customer is a woman who is both style conscious and value seeking.  She is typically married and college educated.  She may be multi-cultural, works at least part-time in a professional position and has above-average household income.

**Merchandising, Purchasing and Pricing**

The Company's fashion assortment is driven primarily by seasonal fashion trends and a focus on name brand and designer merchandise, complemented by a select program of private label and proprietary/exclusive merchandise.

4

The Company's merchants purchase products from approximately 900 vendors. The Company buys a majority of its merchandise at the same time and from many of the same manufacturers as traditional department/specialty stores; however, the Company generally does not require the same level of front and back-end vendor concessions, such as advertising allowances, return privileges and markdown allowances, which are common and significant in the department store industry.

The Company's shoe department and vintage luxury handbag, fragrance and fine jewelry inventory are exclusively supplied and owned by DSW, Inc., LXRandCo, Inc., Scents of Worth and Unique Designs, respectively. Their buyers determine each season's fashion for the Company's shoe, handbag, fragrance and fine jewelry assortments, respectively. The Company receives commissions from the sales of these licensed departments.

The following table sets forth the percentage of sales by major merchandise category, including shoe department sales, for the fiscal years indicated:

|  | 2019 | 2018 |
|---|---|---|
| Women's apparel | 49 % | 48 % |
| Men's | 18 % | 19 % |
| Home | 10 % | 10 % |
| Accessories | 9 % | 9 % |
| Shoes | 9 % | 9 % |
| Other | 5 % | 5 % |
| Total | 100 % | 100 % |

**Locations and Store Appearance**

Most store locations are in neighborhoods, community and regional shopping centers frequented by a more affluent customer. The optimal co-tenants within these shopping centers cater to a similar target customer and include highly-frequented retail formats such as other apparel retailers, higher-end grocers and restaurants. All Stein Mart locations, including the corporate

4851-1563-1045.12

headquarters and distribution centers, are leased.  The typical store is approximately 34,000 gross square feet.

**Ecommerce Capabilities**

The Company sells merchandise offerings on the Company's website, www.steinmart.com.  The Company's site offerings include many of the same products offered in stores, as well as exclusive online products that have greatly expanded as a result of expanded assortments and drop shipments from select vendors.  The Company's site orders can be shipped from its dedicated warehouse, its stores, or, in some cases, directly from vendors.

Another option the Company's site offers is buy online, pick up in store service.  In stores, the Company has "endless aisle" mobile technology to assist customers in locating merchandise across the enterprise and then placing an online order.

The Company's Ecommerce software and warehouse distribution are managed by two third-party providers.

**Loyalty Program**

The Company has a customer loyalty program called SMart Rewards which allows Stein Mart credit cardholders to earn 2 points for every $1 spent at Stein Mart, and Elite cardholders ($500 annual spend) earn 4 points for every $1 spent.  All cardholders receive a $5 reward, called Stein Mart SMart Cash, for every 500 points earned.

The Company has both a co-branded MasterCard and Private Label Credit Card available for customers based on credit approvals.  All Stein Mart credit cardholders participate in SMart Rewards loyalty program.  While the primary purpose of offering credit cards is to increase customer loyalty and drive sales, the Company also receives credit card revenue through a program agreement with its business partner, Synchrony Bank ("Synchrony").

The credit cards are issued by Synchrony. Synchrony bears all credit risk associated with the cards and provides the Company certain direct financial benefits based on sales on the cards and other factors.

**Distribution**

The Company's logistics network consists of consolidation centers ("CCs") located in the Atlanta, Los Angeles and New Jersey areas, and store distribution centers ("SDCs") located in the Atlanta, Dallas and Los Angeles areas.  Approximately 55 percent of the vendor shipments are aggregated at the CCs and then shipped to the SDCs with the remaining 45 percent moving directly from vendors to SDCs.  The SDCs receive, check and prepare the merchandise to ensure it is floor ready for the stores.  The SDCs are automated and virtually all of the vendors are electronic data interchange capable so the Company is able to cross-dock a high percentage of receipts.  Store deliveries are made by contract carriers once or twice a week, depending on location, store volume and the time of year.  The New Jersey CC is owned and operated by a third-party logistics provider.

**Employees**

As of February 1, 2020, the Company's workforce consisted of approximately 9,000 employees (equivalent to approximately 5,000 40-hour employees).  Each store employs an average of 30 persons.  The number of employees fluctuates during the year based on the selling season.  In March 2020, the Company furloughed most store associates and a significant number of associates in its supply chain network and corporate offices due to the COVID-19 pandemic. As the Company's offices and stores have reopened, most corporate employees have returned from furlough; however, a significant number of store and supply chain employees remain on furlough. As of August 1, 2020, the Company's workforce consisted of approximately 7,950

7

employees (equivalent to approximately 3,334 40-hour employees), with approximately 2,950 furloughed. The Company had reduced the number of corporate and store employees following the reopening of the stores as part of an overall effort to reduce expenses and improve profitability.

The Company has no employees subject to collective bargaining agreements.

**Seasonality**

The business is seasonal in nature.  Sales and profitability are historically higher in the first and fourth quarters of the fiscal year, which include the spring and holiday seasons.

**Trademarks**

The Company owns the federally registered trademark Stein Mart®, together with a number of other marks used in conjunction with the private label merchandise program.  The Company believes that the trademarks are important, but, with the exception of Stein Mart®, not critical to the merchandising strategy.

**POPS Initiative**

Beginning in January 2019, management, under the supervision of the Special Committee of the Board of Directors, began working on an initiative to transform the Company's core business model, grow sales volume and increase gross margin by adapting lessons learned from mass off-price retailers.  Known as "POPS," for Path to Off-Price Success, the initiative included substantial changes in store design and layout, advertising strategy and pricing and discounting practices. The Company tested the new business model in the Richmond and Detroit stores. Based on the preliminary success of the test, the Company planned to roll-out the new model to one-third of the Company stores in early 2020.  However, the initiative was put on hold once the Company signed the Merger Agreement with Kingswood.

## Statement of Operations

The Company's Consolidated Statement of Operations (unaudited; in thousands) comparing the first quarter of 2020 with 2019 is set forth below:

| | 13 Weeks Ended May 2, 2020 | 13 Weeks Ended May 4, 2019 |
|---|---|---|
| Net sales | $ 134,273 | $ 314,157 |
| Other revenue | 3,909 | 5,225 |
| Total revenue | 138,182 | 319,382 |
| Cost of merchandise sold | 144,308 | 226,698 |
| Selling, general and administrative expenses | 68,325 | 86,136 |
| Operating (loss) income | (74,451) | 6,548 |
| Interest expense, net | 2,077 | 2,526 |
| (Loss) income before income taxes | (76,528) | 4,022 |
| Income tax (benefit) expense | (10,811) | 53 |
| Net (loss) income | $ (65,717) | $ 3,969 |

## Cash Flow

The Company's Consolidated Statement of Cash Flows (unaudited; in thousands) comparing the first quarter of 2020 with 2019 is set forth below:

| | 13 Weeks Ended May 2, 2020 | 13 We Ended May 4, 2019 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net (loss) income | $ (65,717) | $ 3,969 |
| Adjustments to reconcile net (loss) income to net cash (used in) provided by operating activities: | | |
| Depreciation and amortization | 6,884 | 7,338 |
| Share-based compensation | 155 | 730 |
| Store closing benefits | (40) | (8) |
| Impairment of property and other assets | 10,300 | — |
| Loss on disposal of property and equipment | 1 | 1 |
| Changes in assets and liabilities: | | |
| Inventories | (17,500) | (18,397) |
| Prepaid expenses and other current assets | (4,689) | (4,311) |
| Other assets | 2,822 | (847) |
| Accounts payable | 17,079 | 24,951 |
| Accrued expenses and other current liabilities | (13,412) | 6,244 |
| Operating lease assets and liabilities, net | 4,896 | (2,091) |
| Other liabilities | (1,445) | (2,396) |
| Net cash (used in) provided by operating activities | (60,666) | 15,183 |
| **Cash flows from investing activities:** | | |
| Net acquisition of property and equipment | (1,836) | (1,679) |
| Net cash used in investing activities | (1,836) | (1,679) |
| **Cash flows from financing activities:** | | |
| Proceeds from borrowings | 109,432 | 102,025 |
| Repayments of debt | (53,688) | (102,325) |
| Cash dividends paid | (3) | (49) |

9

| | | | | |
|---|---|---:|---|---:|
| Capital lease payments | | (459) | | (168) |
| Proceeds from exercise of stock options | | 16 | | — |
| Repurchase of common stock | | (82) | | (103) |
| Net cash provided by (used in) financing activities | | 55,216 | | (620) |
| Net (decrease) increase in cash and cash equivalents | | (7,286) | | 12,884 |
| Cash and cash equivalents at beginning of year | | 9,499 | | 9,049 |
| Cash and cash equivalents at end of period | $ | 2,213 | $ | 21,933 |
| **Supplemental disclosures of cash flow information:** | | | | |
| Income taxes received, net | $ | (4) | $ | (182) |
| Interest paid | | 2,323 | | 2,587 |
| Accruals and accounts payable for capital expenditures | | 164 | | 414 |

## 2. Location of Debtors' Operation and Whether Leased or Owned

The Company leases all its retail store locations, support facilities, office and certain equipment under operating leases.  The store leases have varying terms and are generally for 10 years with options to extend the lease term for two or more 5-year periods.  Annual store rent is generally comprised of a fixed minimum amount plus a contingent amount based on a percentage of sales in excess of specified levels.  Most store leases also require additional payments covering real estate taxes, common area costs and insurance.

In 2019, the Company paid approximately $99 million in rent and $37 million in CAM, insurance and real estate taxes.

Following the COVID-19 shutdown, the Company was able to negotiate with the substantial majority of the landlords to defer rent amounts due during the closure period to either a period of month(s) following the reopening of the stores, or in some cases, extending the period of the respective lease term by the amount of time that the stores were closed and paying rent for those future periods.

The Company operates 281 stores in the following 30 states:

| State | Number of Stores | State | Number of Stores |
|---|---:|---|---:|
| Alabama | 8 | Missouri | 3 |
| Arizona | 10 | Nevada | 4 |
| Arkansas | 3 | New Jersey | 4 |
| California | 25 | New Mexico | 1 |
| Colorado | 5 | New York | 3 |

10

| | | | |
|---|---|---|---|
| Delaware | 1 | North Carolina | 20 |
| Florida | 44 | Ohio | 11 |
| Georgia | 13 | Oklahoma | 4 |
| Illinois | 7 | Pennsylvania | 6 |
| Indiana | 7 | South Carolina | 11 |
| Kansas | 3 | Tennessee | 13 |
| Kentucky | 2 | Texas | 41 |
| Louisiana | 7 | Utah | 1 |
| Michigan | 4 | Virginia | 13 |
| Mississippi | 6 | Wisconsin | 1 |

.

The Company leases the following additional facilities:

| Facility | Location | Square Feet |
|---|---|---|
| Distribution Center/Warehouse | Lithia Springs, Georgia | 342,000 |
| Distribution Centers: | Grand Prairie, Texas | 99,000 |
| | Ontario, California | 91,000 |

The Company also leases a 109,000 square foot corporate headquarters in Jacksonville, Florida.

### 3. Reason for Filing Chapter 11

The retail industry has generally experienced difficult business conditions during the past several years. In general, retailers have experience decreased store traffic and have lost market share to fast-growing e-commerce retailers. The declines in store traffic have been especially pertinent for apparel and accessories retailers, such as the Company, which have also experienced lower operating margins as a result. From 2016 through the present, the Company's sales generally declined and the Company faced the difficult task of growing sales while significantly reducing expenses in a difficult retail environment. The on-set of the COVID-19 pandemic, including the store closures and declined store traffic exacerbated the difficult retail environment.

The Company's initial shut-down in March 2020 in response to the COVID-19 pandemic materially, adversely impacted the Company's revenues, liquidity, results of operations and cash

flows, and its ability to pay vendors and landlords according to standard terms. The Company

may have been able to survive following the initial reopening of the stores with the support of its

vendors, landlords and lenders.

However, the July 2020 resurgence of COVID-19 caused a second major decline in

revenues and store traffic. Other large retail bankruptcies, including Brooks Brothers, Lord &

Taylor, Ascena (Ann Taylor), Tailored Brands (Men's Wearhouse and Jos. A. Bank), Sur La

Table, Lucky Brand, JC Penney, J Crew, Neiman Marcus, GNC, Stage Stores, Aldo, Pier 1,

Tuesday Morning and RTW Retailwinds (New York & Co), caused vendors to become nervous

and reluctant to sell new merchandise without payment in advance. The Company's sales decline

in July 2020 made it impossible for the Company to propose a realistic repayment plan for the

outstanding accounts payable owed to vendors from the initial COVID-19 shut-down.

The Company's updated financial projections, following the July resurgence of

COVID-19, indicated that the Company would not have sufficient liquidity to continue operating

the business in the ordinary course consistent with past practice.

The Company's efforts to find a buyer or additional sources of financing, with the

assistance of PJ Solomon Securities, LLC ("PJS"), a leading investment bank serving the retail

industry, were unsuccessful following the termination of the prior merger agreement with

Kingswood in April 2020.

The Company believes the immediate liquidation of the Company's assets by a

professional liquidation advisor under the supervision of the Bankruptcy Court is the best

strategy to maximize value for the benefit of creditors. The Company's current best estimate is

that the liquidation of inventory, equipment, fixtures, leases, intellectual property and similar

assets will produce a gross recovery in the range of approximately $250 million, which is likely

to be sufficient to pay the cost of the liquidation process and Chapter 11 administrative expenses and repay the secured creditors but unlikely to produce any meaningful funds for other creditors. Accurate financial projections are very difficult in the current COVID retail environment.

If Kingswood or another potential buyer steps forward with an offer to buy all or part of the Company as a going concern, the Debtors will pursue a sale to maximize value and preserve the jobs of employees, as well as a potential future tenant for landlords and a potential future customer for vendors. PJS has been actively marketing the Company for over two and one-half years and has a full data room available for potential qualified buyers.

The Debtors' plan for the ultimate conclusion of the case will depend on the success of the process and whether a buyer emerges for a significant portion of the Company's business as a going concern.  If meaningful assets are not available for distribution to unsecured creditors, the Debtors may seek a structured dismissal or conversion to Chapter 7 as more efficient result than confirmation of a plan of reorganization.

### 4. List of Officers, Directors, and Insiders

The following are directors of SM:

| Name<br>Age | Positions with Stein Mart;<br>Principal Occupations and Other Directorships<br>During Past Five (5) Years; Special Experiences,<br>Qualifications and Skills | Year First<br>Became Director of<br>Stein Mart |
|---|---|---|
| Jay Stein<br>(74) | Director of Stein Mart; Chairman of the Board of Stein Mart from 1989 until June 2020; Chief Executive Officer of Stein Mart from June 2013 to March 2016, Interim Chief Executive Officer of Stein Mart from September 2011 to June 2013 and Chief Executive Officer of Stein Mart from 1990 to September 2001 | 1968 |
| Irwin Cohen † ß ¥<br>(79) | Director of Stein Mart; Senior Advisor with the Peter J.  Solomon Company, an investment banking firm, from June 2003 to retirement in October 2013; Global Managing Partner of the Retail and Consumer Products Practice of Deloitte & Touche LLP from 1998 to May 2003; director of Supervalu, Inc. from June 2003 through the sale of the company in October 2018 | 2008 |

13

| Name<br>Age | Positions with Stein Mart;<br>Principal Occupations and Other Directorships<br>During Past Five (5) Years; Special Experiences,<br>Qualifications and Skills | Year First<br>Became Director of<br>Stein Mart |
|---|---|---|
| Thomas L. Cole ¥ †<br>(72) | Director of Stein Mart; Chief Administrative Officer of Macy's, Inc., from February 2009 to retirement in June 2013; Vice Chair of Federated Department Stores from February 2003 to February 2009; various executive positions with Federated Department Stores from 1980 to 2003; and various positions with divisions of the former Allied Stores, from 1972 to 1980. Mr. Cole serves as a Director of Beall's Department Stores (since January 2015), and on the Fashion Advisory Board at Kent State University | 2016 |
| Timothy Cost ¥ ■<br>(61) | Director of Stein Mart; President of Jacksonville University since February 2013; Executive Vice President, Global Corporate Affairs, of PepsiCo, Inc. from December 2010 to January 2013; Chairman of Global Health Care of APCO Worldwide, a public affairs and communications firm, from June to November 2010; Senior Vice President, Corporate Affairs for Wyeth, a healthcare company, from February 2008 until December 2009; Executive Vice President of ARAMARK from 2003 to early 2008; and, in prior years, service in investor relations and communications roles with Pharmacia Corporation, Eastman Kodak Company and Bristol-Myers Squibb. | 2016 |
| Lisa Galanti ¥ ■<br>(65) | Director of Stein Mart; co-founder of Fitzgerald & Co. in 1983 and Managing Director from 1987 until her retirement in 2015. Fitzgerald & Co is a leading marketing communications and advertising agency and an Interpublic Group agency since 1998. | 2016 |
| D. Hunt Hawkins<br>(61) | Director of Stein Mart; Named Chief Executive Officer of Stein Mart in January 2017; promoted to Interim Chief Executive Officer and Director of Stein Mart in September 2016; President and Chief Operating Officer of Stein Mart in April 2014; Executive Vice President and Chief Operating Officer of Stein Mart in December 2011; Executive Vice President and Chief Administrative Officer of Stein Mart in October 2007; Executive Vice President of Operations of Stein Mart in September 2006; Senior Vice President, Human Resources of Stein Mart, February 1994. | 2016 |
| MaryAnne Morin<br>(57) | Director of Stein Mart; President of Stein Mart since February 2017; Chief Merchant, Executive Vice President of Lord & Taylor and Hudson's Bay from 2015 to January 2017; Executive Vice President, Merchandising and Senior Vice President, General Merchandising Manager of Lord & Taylor and Hudson's Bay from 2009 through 2015; Merchandise Manager/Product Director for Macy's Merchandising Group from 2007 through 2009; Managing Director for Echo Design Group/Monsac from 2002 through 2006. | 2018 |
| Richard L. Sisisky ■<br>ß ¥ × (65) | Director of Stein Mart; President of The Shircliff & Sisisky Company, a management consulting company, since 2003; Partner, SilverSolutions Consulting, LLC, a transportation and logistics consulting firm, since 2018; President and Chief Operating Officer and director of ParkerVision, Inc. from 1998 to 2003. | 2003 |

14

| Name<br>Age | Positions with Stein Mart;<br>Principal Occupations and Other Directorships<br>During Past Five (5) Years; Special Experiences,<br>Qualifications and Skills | Year First<br>Became Director of<br>Stein Mart |
|---|---|---|
| Burton M. Tansky ■<br>† ß ¥ (82) | Director of Stein Mart; Senior Advisor with Marvin Traub Associates, a global business development and strategy consulting firm focused on working with brands, retailers, developers and related businesses, since 2017; Chief Executive Officer of the Neiman Marcus Group from 2001 to 2010; President and CEO of The Neiman Marcus Stores from 1994 to 2001; Director of the Howard Hughes Corporation and the Donald Pliner Company. | 2014 |

| | |
|---|---|
| † | Member of the Audit Committee |
| ■ | Member of the Compensation Committee |
| ß | Member of the Corporate Governance Committee |
| × | Lead Director |
| ¥ | Independent Director in accordance with applicable Nasdaq rules |

The Board of Directors of the Company (the "Board") set its annual retainer at $36,000 for 2019.

In addition to the Board's annual retainer, the Board members receive an annual $8,000 meeting attendance retainer, Audit Committee members receive an annual retainer of $16,000 and all other standing committee members receive an annual retainer of $8,000. Non-committee members required to attend committee meetings and ad hoc committee meeting members continue to receive $2,000 per meeting attended.

In fiscal 2019, to compensate certain directors with additional responsibilities, (i) the Lead Director received an additional annual retainer of $40,000, (ii) the Chairperson of the Audit Committee received an additional annual retainer of $25,000, and (iii) the Chairperson of the Compensation Committee received an additional annual retainer of $25,000.

In response to the coronavirus (COVID-19) outbreak, the Company temporarily suspended the Board members' compensation.

15

## Director Compensation for Fiscal Year Ended February 1, 2020

| Name [1] | Fees Earned or Paid in Cash ($) | Stock Awards ($) [2] | Option Awards ($) [2] | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation ($) [3] | Total ($) |
|---|---|---|---|---|---|---|---|
| Jay Stein [4] | $    24 | $    — | $    — | $    — | $    — | $  137,701 | $  137,725 |
| Irwin Cohen | 146,000 | — | — | — | — | 233 | 146,233 |
| Thomas L. Cole | 115,000 | — | — | — | — | 233 | 115,233 |
| Timothy Cost | 71,000 | — | — | — | — | 233 | 71,233 |
| Lisa Galanti | 67,000 | — | — | — | — | 233 | 67,233 |
| Richard L. Sisisky | 151,000 | — | — | — | — | 233 | 151,233 |
| Burton M. Tansky | 114,000 | — | — | — | — | 233 | 114,233 |

[1] The compensation received by Hunt Hawkins, the Chief Executive Officer and director and MaryAnne Morin the President and director, are shown in the Summary Compensation Table. Mr. Hawkins and Ms. Morin received no additional compensation for their services as a director.

[2] During fiscal year 2019, the non-employee directors named above did not receive any share-based awards. At February 1, 2020, the directors had the following stock and option awards outstanding from prior years:

(a) Mr. Stein:  none.

(b) Mr. Cohen:  7,112 restricted shares and no options.

(c) Mr. Cole:  7,112 restricted shares and 4,000 options.

(d) Mr. Cost:  7,112 restricted shares and 4,000 options.

(e) Ms. Galanti:  7,112 restricted shares and 4,000 options.

(f) Mr. Sisisky:  7,112 restricted shares and no options.

(g) Mr. Tansky:  7,112 restricted shares and 5,748 options.

[3] Includes, for all directors, amounts paid as dividends on unvested restricted stock awards that vested during the year.

[4] Mr. Stein, a former executive officer of Stein Mart, remains an employee of Stein Mart and does not receive additional compensation for his services as director.  Other compensation for Mr. Stein includes $24 for base salary, $9,545 for an automobile allowance, $98,040 for imputed income for the value of split dollar pre-retirement death benefit, and $30,091 for medical benefits not provided to non-executive employees (which includes excess medical, dental and vision payments).

The table below summarizes the compensation paid or accrued by the Company to its executive officers.  For fiscal 2019, the Company paid each executive officer a salary.  The Company did not pay any equity compensation or any bonuses to executive officers in 2019, other than a prior contractual sign-on bonus to James B Brown.

In response to the COVID outbreak, the Company temporarily reduced the salaries of executive management by 20 percent.

4851-1563-1045.12

## Summary Compensation Table

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards ($)[1] | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($)[2] | Total ($) |
|---|---|---|---|---|---|---|---|---|
| D. Hunt Hawkins | 2019 | $ 750,000 | $ — | $ — | $ — | $ — | $ 60,728 | $ 810,728 |
| Chief Executive Officer | 2018 | 620,378 | — | 370,000 | | | 44,818 | 1,035,196 |
| MaryAnne Morin | 2019 | 744,792 | — | — | | | 44,833 | 789,625 |
| President | 2018 | 728,195 | 181,250 | 323,750 | — | — | 27,757 | 1,260,952 |
| James B. Brown | 2019 | 400,000 | 50,000 | — | — | — | 24,862 | 474,862 |
| Executive Vice President, Chief Financial Officer | 2018 | 50,000 | 50,000 | 112,000 | — | — | 143 | 212,143 |

[1]    The amounts reflect the aggregate grant date fair value computed in accordance with accounting principles generally accepted in the United States of America ("GAAP") of stock awards made during the fiscal years indicated.  Forfeiture estimates have been disregarded in determining the amounts indicated.  The grant date fair value of restricted share unit awards granted in fiscal 2018 was based on the closing price of the common stock on the applicable grant dates.

[2]    All other compensation:

| Name | Year | Perquisites and Other Personal Benefits ($)[a][b] | Termination Payments ($) | Dividends Paid on Restricted Stock Awards ($) | Company Contributions to 401(k) Plans ($) | Total ($) |
|---|---|---|---|---|---|---|
| D. Hunt Hawkins | 2019 | $ 57,928 | $ — | $ — | $ 2,800 | $ 60,728 |
| MaryAnne Morin | 2019 | 42,561 | — | — | 2,272 | 44,833 |
| James B. Brown | 2019 | 24,529 | — | — | 333 | 24,862 |

[a]    Perquisites and other personal benefits consist of automobile allowances; medical benefits not provided to non-executive employees (includes excess medical, dental and vision payments); medical administration and reinsurance cost-plus long-term disability and group life premiums; and a moving reimbursement for Mr. Brown.  Perquisites and other personal benefits include $43,015 and $27,648 in excess medical benefits for Mr. Hawkins and Ms. Morin, respectively. No single other item exceeds the greater of $25,000 or 10% of the aggregate value of all perquisites and other personal benefits received by any of the named executive officers.

[b]    All perquisites and other personal benefits are valued on the basis of the aggregate incremental cost to us.

[3]    Mr. Brown was named Chief Financial Officer effective December 17, 2018.  Mr. Brown's base salary for 2018 was $400,000 commencing on his start date of December 17, 2018, of which Mr. Brown was paid $50,000 in fiscal 2018.  In addition, Mr. Brown received a sign-on bonus of $100,000, with $50,000 paid in fiscal 2018 and $50,000 paid in fiscal 2019.

The following are the Debtors' other executive officers.

| NAME | TITLE |
|---|---|
| Steve Horowitz | SVP, Strategy & Development |
| Chantelle Quick | SVP, Controller |
| Robert Devine | SVP, Chief Legal Officer |

4851-1563-1045.12

| Nick Swetonic | SVP, Planning, Allocation & E-commerce |
| Glori Katz | SVP, Marketing & Advertising |
| John Hegedus | SVP, Stores |
| Nadine Rauer | SVP, GMM, Ladies & Kids |

### 5. Debtors' Annual Gross Revenues

Debtors' total annual revenue for the year ended February 1, 2020 was $1.236 billion. Debtors' total revenue during the 13 weeks ending May 2, 2020 was $138,182,000.  In comparison, the Debtors' total revenue during the 13 weeks ending May 4, 2019, was $319,382,000.

### 6. Amounts Owed to Various Creditors

The Debtors estimate their total liabilities to be $770,503,000 as of July 4, 2020 (June month end), which includes operating lease liabilities of $413,432,000. The most recent internal, unaudited month-end balance sheet, as of July 4, 2020 is set forth below (in thousands):

18

|  |  |  |  | Unaudited |
|---|---|---|---|---|
| **ASSETS** |  |  |  | 7/4/2020 |
| Current assets: |  |  |  |  |
|  | Cash and cash equivalents |  |  | $    21,373 |
|  | Inventories |  |  | 207,694 |
|  | Prepaid expenses and other current assets |  |  | 25,375 |
|  |  | Total current assets |  | 254,442 |
|  |  |  |  |  |
| Property and equipment, net |  |  |  | 88,056 |
| Operating lease assets |  |  |  | 357,436 |
| Other assets |  |  |  | 23,528 |
|  |  | Total assets |  | $  723,462 |
|  |  |  |  |  |
| **LIABILITIES AND SHAREHOLDERS' (DEFICIT) EQUITY** |  |  |  |  |
| Current liabilities: |  |  |  |  |
|  | Accounts payable |  |  | $    97,596 |
|  | Current portion of debt |  |  | 143,869 |
|  | Current portion of operating lease liabilities |  |  | 97,952 |
|  | Accrued expenses and other current liabilities |  |  | 76,516 |
|  |  | Total current liabilities |  | 415,933 |
|  |  |  |  |  |
| Long-term debt |  |  |  | 9,415 |
| Noncurrent operating lease liabilities |  |  |  | 315,480 |
| Other liabilities |  |  |  | 29,675 |
|  |  | Total liabilities |  | 770,503 |
|  |  |  |  |  |
| Shareholders' (deficit) equity: |  |  |  |  |
|  | Common stock |  |  | 485 |
|  | Additional paid-in capital |  |  | 61,930 |
|  | Retained deficit |  |  | (109,673) |
|  | Accumulated other comprehensive income |  |  | 217 |
|  |  | Total shareholders' (deficit) equity |  | (47,041) |
|  |  | Total liabilites and shareholders' (deficit) equity |  | $  723,462 |

**Accrued Expenses and Other Current Liabilities**

The following table sets forth the major components of accrued expenses and other

current liabilities (in thousands):

| | May 2, 2020 | February 1, 2020 | May 4, 2019 |
|---|---|---|---|
| Property taxes | $  20,479 | $  20,532 | $  18,557 |
| Unredeemed gift and merchandise return cards | 10,154 | 11,488 | 9,631 |
| Compensation and employee benefits | 6,046 | 7,448 | 6,691 |
| Accrued vacation | 2,546 | 3,909 | 4,316 |
| Other | 27,203 | 36,854 | 44,923 |
| Accrued expenses and other current liabilities | $  66,428 | $  80,231 | $  84,118 |

**Trade Accounts Payable – Vendors**

As of July 4, 2020, the Company owed approximately $95 million to vendors for merchandise.

**Gift Cards**

As of July 4, 2020, the Company's gross liability for gift cards, without reduction for breakage or offset, was approximately $35 million.

**Dividends**

On May 17, 2017, the Company suspended its quarterly dividend and has not paid a dividend thereafter.

**Debt**

The following table sets forth the Company's debt (in thousands):

| | May 2, 2020 | February 1, 2020 | May 4, 2019 |
|---|---|---|---|
| Revolving credit facility | $  152,000 | $  107,100 | $  118,800 |
| Term loan | 35,000 | 35,000 | 35,000 |
| Promissory notes | 10,844 | — | — |
| Total debt | 197,844 | 142,100 | 153,800 |
| Current portion [1] | (197,228) | — | — |
| Debt issuance costs | (616) | (662) | (801) |
| Long-term debt | $  — | $  141,438 | $  152,999 |

[1]    Due to the uncertainties concerning the Company's future liquidity and on-going covenant compliance as a result of the impact of the COVID-19 pandemic on the Company's business, the amount outstanding under the Wells Fargo Revolving Credit Facility and Gordon Brothers Term Loan are classified as a current liability in the consolidated balance sheet as of May 2, 2020.  The Promissory Notes are also considered current liabilities.

20

*Wells Fargo Revolving Credit Facility*

The Company borrows from Wells Fargo Bank pursuant to a $240.0 million senior secured revolving credit facility. The maximum amount available for borrowings under this facility, or the Loan Cap, is the lesser of $240.0 million or the borrowing base.  The borrowing base is an amount equal to (i) ninety percent (90%) of eligible credit card receivables, plus (ii) ninety-five percent (95%) of the estimated recovery percentage in going-out-of-business sale multiplied by the cost of eligible inventory, net of inventory reserves, minus (iii) any availability reserves. As a result of a Fifth Amendment to the Credit Agreement executed June 11, 2020, the Company is required at all times to maintain excess availability under this facility of not less than $7.5 million.

The interest rate is floating and determined by a complex formula.  Generally speaking, immediately prior to the petition, the interest rate was either (i) 2.25% plus Adjusted LIBOR or (ii) 1.25% plus the Base Rate.

As of the petition date, the Company owed approximately $84 million to Wells Fargo under the revolving credit facility.

Pursuant to the loan terms, all of the Company's cash receipts are swept daily to repay borrowings from Wells Fargo under the facility.

Wells Fargo has a first lien on substantially all the Company's personal property.

Wells Fargo and the Company have entered into an understanding that Wells Fargo will permit the Debtors' use of certain cash collateral pursuant to an approved budget to provide funds for the Chapter 11 liquidation.

*Term Loan*

The Company has a $35 million secured term loan from Gordon Brothers Finance Company.  The term loan is secured by a second lien security interest (subordinate only to the

liens in favor of Wells Fargo securing the revolving credit facility) on all assets securing the revolving loan (which consist of substantially all personal property), except furniture, fixtures and equipment and intellectual property, upon which Gordon Brothers has a first lien security interest.

The interest rate on the term loan is floating and determined by a complex formula. Generally speaking, immediately prior to the petition, the interest rate was 8.25% plus LIBOR (not less than 1.5%).

As of the petition date, approximately $35 million is owed to Gordon Brothers under the term loan.

*Promissory Notes*

The Company has borrowed approximately $9.9 million from Sun Bank, which is secured by the cash surrender value of the life insurance policies which are held by the Trustee for a Rabbi Trust related to the Company's executive deferred compensation plans at a rate of 3.56 percent per annum. At May 2, 2020, the cash surrender value of the life insurance policies was approximately $11.1 million. The entire unpaid principal and accrued interest balance is due and payable on or before September 30, 2020.

On April 6, 2020, the Company executed a promissory note to borrow $1.0 million for property insurance premiums through Bank Direct Capital Finance at a rate of 4.25 percent per annum. The entire unpaid principal and accrued interest balance is due and payable on or before February 1, 2021.

On July 9, 2020, the Company executed a promissory note to borrow $1.9 million for various insurance premiums through Bank Direct Capital Finance at a rate of 4.25 percent per annum. The entire unpaid principal and accrued interest balance is due and payable on or before March 1, 2021.

22

*U.S. Small Business Administration Loan*

On June 23, 2020, the Company entered into an agreement to receive a U.S. Small Business Administration Loan ("SBA Loan") from Harvest Small Business Finance, LLC related to the COVID-19 pandemic in the amount of $10 million, which the Company received on June 30, 2020. The SBA Loan has a fixed interest rate of 1.00 percent per annum and a maturity date five years from the date on which the Company applies for loan forgiveness under section 1106 of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pursuant to the terms of the SBA Loan, the Company may apply for forgiveness of the amount due on the SBA Loan in accordance with the requirements of the Paycheck Protection Program, including the provisions of Section 1106 of the CARES Act.

**Capital Leases**

Stein Mart has entered into two separate finance agreements for Light-Emitting Diode ("LED") lighting in certain of its stores. Depending on the scope of the lighting remodel, the leased lighting equipment has a useful life of five years or ten years.

The Company also has entered into capital leases of networking and telephone equipment.

**Off-Balance Sheet Arrangements**

The Company has outstanding standby letters of credit totaling approximately $10 million securing certain insurance programs.

### 7. Debtors' Current and Fixed Assets

The Company estimates its total assets to be $ 723,462,000 as of July 4, 2020 (June month end), which includes operating lease assets of $357,436,000. Please see the recent balance sheet included in Section 6 above.

**Property and Equipment, Net**

The following table sets forth property and equipment, net (in thousands):

|  | May 2, 2020 | February 1, 2020 | May 4, 2019 |
|---|---|---|---|
| Fixtures, equipment and software | $ 243,867 | $ 245,034 | $ 239,522 |
| Leasehold improvements | 129,562 | 132,772 | 130,575 |
| Total | 373,429 | 377,806 | 370,097 |
| Accumulated depreciation and amortization | (282,414) | (275,913) | (255,845) |
| Property and equipment, net | $ 91,015 | $ 101,893 | $ 114,252 |

### 8. Number of Employees and Gross Amount of Wages Owed As of the Petition

On August 1, 2020, the Company had approximately 7,950 employees.

On August, 11, 2020, the day prior to the filing of the Petition, the Company delivered Warn Act Closing Notices to the employees in the Jacksonville office and Atlanta distribution center and the Company terminated most employees involved in the merchandise buying and other employees considered nonessential for the liquidation of the Company.

### 9. Debtors' Payroll and Sales Tax Obligation

As of July 4, 2020, the Debtors owed approximately $4,039,035 in state sales tax and approximately $1,501,523 in payroll taxes.

### Anticipated Emergency Relief

The Debtors have filed the following emergency motions on the first day of the case:

1. Debtors' Emergency Motion Pursuant To Fed. R. Bankr. P. 1015(B) for Entry of Order Directing Joint Administration of Related Chapter 11 Cases and Request For Emergency Hearing

2. Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral and Affording Adequate Protection; (II) Modifying Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief

3. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A) And 363 For Entry Of Interim and Final Orders (I) Approving Cash Management System, (II) Authorizing the Debtors to Continue Using Existing Bank Accounts and Business Forms and (III) Authorizing the Debtors to Continue Intercompany Transactions

4. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A) and 521, and Fed. R. Bankr. P. 1007(A) and 2002(A) and (F), for Entry of an Order Authorizing the Debtors to (A) Prepare a List of Creditors in Lieu of a Formatted Mailing Matrix, (B) File a Consolidated List of the Debtors' 20 Largest Unsecured Creditors, (C) Mail Initial Notices and (D) Waiving the Requirement to File a List of Equity Security Holders

5. Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consultant Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Approving the Implementation of Customary Store Bonus Program and Payments to Non-Insiders Thereunder

6. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A), 363(B), 365 and 507(A) for Interim and Final Authority to (I) Maintain and Administer Pre-Petition Customer Programs, Promotions, and Practices, (II) Pay and Honor Related Pre-Petition Obligations, and (III) Direct the Credit Card Processors to Honor the Debtors' Credit Card Processing Agreement Pending its Assumption or Rejection

7. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A) and 521(A) and Fed. R. Bankr. P. 1007(C) for Entry of an Order Extending Time to File Their Schedules of Assets and Liabilities and Statements of Financial Affairs

8. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A), 363(B), and 503(B) for Interim And Final Authority to (I) Maintain, Renew, and Continue Their Insurance Policies and Programs and (II) Honor All Insurance Obligations

9. Debtors' Emergency Motion to Establish Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 Professionals

10. Debtors' Emergency Motion for Entry of an Order Authorizing and Approving Procedures for Rejection of Executory Contracts and Unexpired Leases

11. Debtors' Emergency Motion to Establish Procedures to Permit Monthly Payment of Interim Fee Applications of Chapter 11 Professionals

12. Emergency Motion  of Debtors for Entry of Order (I) Authorizing Debtors to Redact Certain Personal Identification Information in Creditor List and Certain Other Documents and (II) Granting Related Relief

13. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105 and 363 for Interim and Final Orders Authorizing the Debtors to Pay Pre-Petition Shipping Charges in the Ordinary Course of Business

14. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A), 363, and 507(A) for Interim and Final Authority to (I) Pay Certain Pre-Petition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, and (III) Continue Employee Benefits Programs, and for Related Relief

4851-1563-1045.12

15. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A), 363(B), 507(A), and 541 for Entry of an Order Authorizing, but not Directing, the Debtors to Pay Certain Pre-Petition Taxes and Fees

16. Debtors' Emergency Motion Pursuant to 11 U.S.C. §§ 105(A) and 366 for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Establishing Procedures for Determining Adequate Assurance of Payment for Future Utility Services, and (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Service

17. Emergency Motion of Debtors Pursuant to 11 U.S.C. §§ 105(A), 327 and 330 for Authority to Employ Professionals Used in the Ordinary Course of Business

**Debtors' Strategic Objective**

The Debtors intend to promptly liquidate their assets through a series of going out of business sales conducted by a contractual joint venture comprised of Hilco Merchant Resources, LLC, Gordon Brothers Retail Partners, LLC, Great American Group, LLC, Tiger Capital Group, LLC, SB360 Capital Partners, LLC ( the "Hilco JV"), as a fee-based consultant.

Prior to bankruptcy, the Company, acting with the assistance of Clear Thinking Group ("CTG"), its financial advisor, solicited proposals from five nationally recognized liquidation consultants. The Debtor initially received two proposals.  The first proposal was from SB 360 Capital Partners, LLC and the second was from a Hilco lead joint venture that did not include SB 360.  CTG sought to negotiate improvements to the two proposals and after final negotiations in consultation with the Debtors believed the proposals to be very similar. SB 360 subsequently joined the Hilco JV.

The Debtors are of the view that in the current environment, where numerous large retailers are being simultaneously liquidated, joint venture liquidation bids are common because a single liquidation firm may not have the resources to staff and manage the entire project. The Debtors through consultation with their advisors believe that the liquidation companies comprising the Hilco JV are respected and experienced in the industry and the Hilco JV has the

26

ability to successfully execute the assignment.  The Debtors in consultation with their advisors believe that the terms and fees of the contract with the Hilco JV are fair and reasonable to the Company and are consistent with current market terms for this type project.

The Company's agreement with the Hilco JV was the product of arms-length bargaining. Wells Fargo, the largest asset based lender to national retailers, through its counsel, participated in the negotiation of the contract. Wells Fargo supports the contract.

The Company requires an advisor, like the Hilco JV, to assist with the liquidation process. The firms comprising the Hilco JV have played major roles in the liquidation of numerous large retailers in Chapter 11.

The Debtors, with the assistance of the Hilco JV, started the store closing sale process prior to bankruptcy.  All signs are prepositioned at the stores to formally announce the sale and the Hilco JV has deployed personnel to the stores. The Debtors desire to continue the sale process and place going-out-of-business signage in the stores with the Court's approval so as to take advantage of the inherent increase in customer traffic and sales during the weekend. Obtaining authorization to continue the sale on Friday August 14, 2020 while permitting the use of going out of business signage will permit the Debtors to maximize the potential sales that weekend and gives the Debtors a better chance of being able to successfully operate while using cash collateral.

The Debtors will seek to sell leases and intellectual property.  However, substantial doubt exists as to whether any buyers will be found for leases given the current depressed condition of the retail real estate market. The Debtors do not anticipate the sale of intellectual property will produce substantial value.

The Company's current best estimate is that the liquidation of inventory, equipment, fixtures, leases, intellectual property and similar assets will produce a gross recovery in the range of approximately $250 million, which is likely to be sufficient to pay the cost of the liquidation process and Chapter 11 administrative expenses and repay secured creditors but unlikely to produce any meaningful funds for other creditors.  Accurate financial projections are very difficult in the current COVID retail environment.

The Company, with extensive support from CTG, has developed a detailed 13 week cash forecast and budget for the liquidation process.  Wells Fargo and Gordon Brothers have reviewed the budget and discussed it with CTG and the Company on multiple occasions. This budget serves as the basis for the budget in the Cash Collateral Order. The Company believes that the budget is reasonable and will be sufficient to pay all the costs of liquidation and all the administrative expenses of the Chapter 11 case.  However, the economic conditions resulting from the on-going COVID-19 resurgence and the unpredictable nature of a bankruptcy proceedings make accurate financial projections difficult.

The Debtors believe the sale of the Company as a going concern is not a realistic possibility under present conditions. PJS has been actively marketing the Company for over two and one-half years. On January 29, 2018, the Company issued a press release announcing that a Special Committee of the Board had engaged PJS as its financial advisor in connection with the Special Committee's work to identify and explore all potential strategic alternatives available to the Company, including a potential sale of the Company.  During early 2018, PJS conducted a sale process and contacted 15 parties, which included a mix of both strategic companies and financial sponsors, and responded to four inbound queries without finding an acceptable buyer.

On January 4, 2019, all the independent members of the Board met with PJS to discuss whether the opportunity existed to sell the Company. PJS reported that private equity firms were generally no longer investing in the retail sector and that with respect to strategic investors, the situation was dependent on the retailer having a compelling strategic rationale and sufficient financial flexibility. PJs reported that several of the strategic buyer contacted the prior year had experienced stock declines and deterioration in their own financial performance, which would make it difficult for them to pursue a transaction. The consensus of the board and advisors was that renewing the sale process at that time would not be worth the effort.

In the spring of 2019, at the Special Committee's request, PJS contacted 71 potential strategic and financial buyers as part of the sale process that ultimately resulted in the Kingswood merger agreement.

Since the termination of the Kingswood merger, PJS has spoken with 13 parties, six of whom were involved in the 2019 sale process.  Two parties have conducted due diligence. One party subsequently advised the Company that it was not interested in pursuing an acquisition. The remaining party has investigated the acquisition in bankruptcy of a rightsized store base but no offer has been made. PJS has a full data room available for potential qualified buyers to conduct due diligence. If a buyer emerges, the Debtor intends to engage PJS to assist with the sale process.

The Debtors' plan for the ultimate conclusion of the Chapter 11 case will depend on the success of the process and whether a buyer emerges for a significant portion of the Company's business as a going concern.  If meaningful assets are not available for distribution to unsecured creditors, the Debtors may seek a structured dismissal or conversion to Chapter 7 as a more efficient result than confirmation of a plan of reorganization.

4851-1563-1045.12

Dated: August 12, 2020

Respectfully submitted,

FOLEY & LARDNER LLP

*/s/ Gardner F. Davis*

    Gardner F. Davis (FL 0471712)
        Telephone: 904.359.8726
        Email: gdavis@foley.com
    John J. Wolfel (FL 30664)
        Telephone: 904.359.8778
        Email: jwolfel@foley.com
    Neda A. Sharifi (FL 112172)
        Telephone: 904.359.8719
        Email: nsharifi@foley.com
    Richard E. Guyer (FL 1004150)
        Telephone: 904.633.8902
        Email: rguyer@foley.com
    One Independent Drive, Suite 1300
    Jacksonville, FL 32202-5017
and
    Mark J. Wolfson (FL 0352756)
    Foley & Lardner LLP
    100 N Tampa St Suite 2700
    Tampa, FL 33602
    Telephone:  813.225.4119
    Email: mwolfson@foley.com
and
    Marcus Helt (TX 24052187)
    Foley & Lardner LLP
    2021 McKinney Avenue, Suite 1600
    Dallas, TX 75201
    Telephone:  214.999.4526
    Email: mhelt@foley.com
    *Pro hac vice admission pending*

*Proposed Counsel for Debtors
and Debtors in Possession*

4851-1563-1045.12