ORDERED.

Dated: March 29, 2021

*Jerry A. Funk*
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

STEIN MART, INC.,
STEIN MART BUYING CORP.,
STEIN MART HOLDING CORP.,

    Debtors.
_____/

Chapter 11
Case No.   3:20-bk-2387-JAF
Case No.   3:20-bk-2388-JAF
Case No.   3:20-bk-2389-JAF
(Jointly Administered)

## FINDING OF FACTS AND CONCLUSIONS OF LAW

This case came before the Court for a confirmation hearing and final approval of Disclosure Statement of Debtors' Combined Plan of Liquidation (the "Proposed Plan"), submitted by Debtors STEIN MART, INC. ("Stein Mart"), STEIN MART BUYING CORP., and STEIN MART HOLDING CORP. (collectively, "Debtors"). (Doc. 848). An objection to confirmation was filed by NANCY J. GARGULA, the United States Trustee for Region 21 (the "U.S. Trustee"), as well as by the UNITED STATES SECURITIES AND EXCHANGE COMMISSION (the "SEC"). (Docs. 934 & 936). A confirmation hearing was held on March 11, 2021. (Doc. 965). Based on the argument and evidence presented, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rules 9014(c) and 7052.

**FINDINGS OF FACT**

On August 12, 2020, Debtors filed respective petitions under Chapter 11 of the Bankruptcy Code. The Court entered an order directing the joint administration of Debtors' cases. (Doc. 94). The U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Creditor's Committee") to represent the interests of the unsecured creditors, treated under Class 6 of the Proposed Plan. (Doc. 137). Debtors continued to operate their business and manage their properties as debtors in possession. (Doc. 4). In January 2021, Debtors filed their Proposed Plan together with their Disclosure Statement. (Doc. 848) (the Proposed Plan); (Doc. 849) (the Disclosure Statement). In their motion to conditionally approve the Disclosure Statement, Debtors attached their Notice of Non-Voting Status and Opt-Out Form (the "Opt-Out Form"). (Doc. 850-1). The Disclosure Statement was conditionally approved, and a confirmation hearing was set for March 11, 2021. (Doc. 853).

Debtors are Florida corporations with headquarters in Jacksonville, Florida. Debtor Stein Mart owns all the stock of the other two debtors, and the three entities operate as a single business. Stein Mart is a publicly traded company that was formerly listed on the NASDAQ Exchange but is now traded over the counter. Debtors operated a nationwide discount department store chain with roughly 281 retail stores and 8,000 to 9,000 employees (equivalent to approximately 5,000 40-hour employees). From 2016, Stein Mart's sales generally declined because of the growth of e-commerce and other factors.

Prior to the COVID pandemic, in January 2020, Debtors entered into a merger agreement with Kingswood Capital Management, LLC ("Kingswood") and an entity managed by Jay Stein, the then chairman of Stein Mart. Under the merger agreement, Stein Mart's equity shareholders (the "Shareholders") would have received $0.90 in cash for each share of common stock owned. However, the Shareholders were never given an opportunity to vote on the merger agreement. In

April 2020, the merger agreement was terminated prior to closing because the pandemic caused Debtors to be unable to satisfy the minimum liquidity closing conditions contained in the agreement. Debtors subsequently continued discussing a sale of the company to Kingswood, but an agreement was never reached. Debtors' further efforts to find a different buyer or additional sources of financing also proved unsuccessful. Debtors then determined a Chapter 11 liquidation was the best strategy going forward.

Chiefly, the Proposed Plan proposes to liquidate Debtors' assets and distribute those funds to creditors in accordance with the same priority scheme as a Chapter 7 liquidation. After the liquidation is complete, Debtors will be dissolved. (Doc. 848 at 31). Ninety-one percent (91%) of unsecured creditors voted in favor of the Plan, which represents roughly ninety-six percent (96%) of the total unsecured claims by dollar amount. (Doc. 949-1). Shareholders were not entitled to vote on the Proposed Plan. Under the Proposed Plan, the unsecured creditors would receive payment equal to roughly eight percent (8%) of their total claims. Additionally, the Proposed Plan contains a choice-of-law provision establishing Florida law as governing law to the extent federal law does not provide a specifically applicable rule of law. (Doc. 848 at 18).

The Creditor's Committee filed a statement in support of the Proposed Plan (the "Committee Statement"). (Doc. 951). The Committee Statement provides that the Proposed Plan "represents the best possible outcome for unsecured creditors and the most viable path to maximize creditor recoveries" in these cases. (Doc. 951 at 1). The Creditor's Committee investigated whether there was any potential liability on the part of the Debtors or Debtors' directors and officers. The Creditor's Committee found no evidence supporting any meritorious claims, and the Court is not aware of anything indicating any meritorious claims against Debtors' directors/officers. As a result of its investigation and negotiation with Debtors, the Creditor's

Committee asked Debtors to forgo purchasing a directors and officers liability tail policy (the "D&O Tail Policy"), which would have cost $2.8 million. The D&O Tail Policy would cover directors' and officers' liability after the company is dissolved (i.e., after Debtors stop paying the premium on the existing D&O policy). Forgoing the D&O Tail Policy would save Debtors $2.8 million and allow the money to flow to unsecured creditors. The evidence indicates that, without the $2.8 million, unsecured creditors would receive nothing. In light of forgoing the D&O Tail Policy, various liability releases were included in the Proposed Plan. These releases are the subject of the U.S. Trustee's and the SEC's objections to confirmation.

Relevant are the releases contained in Articles VIII.C., VIII.D., VIII.E., and VIII.F of the Proposed Plan. (Doc. 848 at 43-49). Article VIII.C. (the "Debtors' Release") contains a release granted by Debtors in favor of numerous parties concerning a broad scope of existing and future-arising claims related to (among other things) the prepetition management and operation of Debtors, Debtors' efforts to obtain a merger agreement, Debtors' efforts to obtain a sale agreement, the wind-down of Debtors, issuance of securities and/or bonds by Debtors, acts/omissions of the Debtors' directors/officers and their ownership/operation of the companies, the filing and conduct of this Chapter 11 case, settlement of claims of secured creditors, the preparation and negotiation of the Proposed Plan, et cetera. Such released claims include derivative claims. Further, the types of claims expressly excepted include only "claims related to any act or omission that is determined in a Final Order to have constituted actual fraud." (Doc. 848 at 48).

Article VIII.D. (the "Third-Party Release") contains a largely identical release granted by the "Releasing Parties" *in favor of* the Debtors, the Creditor's Committee, the plan administrator, and numerous others concerning the same broad scope of claims covered in the Debtors' Release. (Doc. 848 at 47). As its only exemption, the Third-Party Release contains the same actual-fraud

4

exemption as the Debtors' Release.  The "Releasing Parties" (or third-party releasors) granting the Third-Party Release include, among others, "all holders of claims or interests that vote to reject the Plan or are deemed to reject the Plan <u>and</u> who do not affirmatively opt out of the releases provided by the Plan by checking the box on the [Opt-Out Form] indicating that they opt not to grant the releases provided in the Plan."  (Doc. 848 at 15).  In other words, the Third-Party Release grants a release *by* any Shareholder or unsecured creditor (among others) who fails to affirmatively opt out of the release by using the Opt-Out Form.  At least fourteen (14) of the general unsecured creditors opted out of the Third-Party Release.  (Doc. 949-2).  It is unclear whether any Shareholders opted out of the release.

The Opt-Out Form is a five-page document with a conspicuous bold checkbox label, "OPT OUT of the Consensual Third-Party Release Provision."  (Doc. 850-1 at 30).  The form provided for return of the form by first-class mail and by online submission.  (Doc. 850-1 at 33).  Overnight courier and overnight mail were also listed as potential options.  (Doc. 850-1 at 29).  The form included an addressed first-class return envelope.  The instructions included on the form were clear enough for a reasonable investor to comprehend.  The form also included a domestic telephone number, an international telephone number, and an email address for parties in interest to contact with questions.

Article VIII.E. (the "Exculpation Clause") waives all liability of the Debtors, the Creditor's Committee, the plan administrator, and others for post-petition conduct occurring during the bankruptcy case.  The Exculpation Clause provides as follows:

> 45.  "Exculpated Party" means collectively, and in each case solely in its capacity as such: (a) the Debtors; (b) the Committee and each of its members; (c) the Agents and Lenders [i.e., secured creditors]; (d) the Plan Administrator; and (e) with respect to each of the above and the foregoing Entities in clauses (a) though (d), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity

holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, Professionals and other professionals, each in their capacity as such.

. . .

*E. Exculpation.* Notwithstanding anything herein to the contrary, the Exculpated Parties shall neither have nor incur, and each Exculpated Party is released and exculpated from, any liability to any Holder of a Cause of Action, Claim, or Interest for any postpetition act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan (whether or not such issuance or distribution occurs following the Effective Date), negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed hereunder, **except for actions determined by a Final Order to have constituted actual fraud**, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

(Doc. 848 at 10, 48) (emphasis added).

Finally, Article VIII.F. (the "Injunction") permanently enjoins any holder of a released claim from enforcing the claim, collecting on the claim, encumbering property of released entities, asserting any right of setoff or recoupment in relation to the claim, et cetera. These releases are exceptionally broad in scope, both as to the scope of claims involved and the scope of parties on both sides of the releases.

## CONCLUSIONS OF LAW

"Section 1129 of the Bankruptcy Code provides that a court shall confirm a Chapter 11 plan if it complies with each of the requirements set forth therein." In re Monticello Realty Investments, LLC, 526 B.R. 902, 912 (Bankr. M.D. Fla. 2015). "The Debtor has the burden of proving by a preponderance of the evidence each of the elements of § 1129." Id.

The U.S. Trustee and the SEC argue the Proposed Plan should not be confirmed because: 1) the Third-Party Release is nonconsensual as to the Shareholders; 2) being that it is nonconsensual, the Third-Party Release does not meet the Dow Corning factor test adopted by the Eleventh Circuit; 3) the Debtor's release is unsupported by consideration and is overly broad; 4) the Exculpation Clause is nonconsensual, fails to meet the Dow Corning factor test, and goes beyond the safe-harbor provision found in § 1125(e); 5) the Third-Party Release is also a first-party release which the Court has no authority to approve because the release effectively grants a *de facto* discharge of debts that would be excepted from discharge under § 523 and § 1141(d)(3); and 6) Shareholders have not received any consideration in exchange for granting the release and the release is, therefore, unenforceable against the Shareholders.[1]

These issues are addressed, in turn.

**I.    Whether the Third-Party Release is consensual under Florida law.**

"With increasing frequency, bankruptcy courts [ ] have been asked to confirm plans that contain permanent injunctions or releases that benefit parties that are not debtors."  6 Norton Bankr. L. & Prac. 3d § 114:5 (Jan. 2021).  "These cases may be divided for ease of understanding into four different categories." Id.  Applicable here, "[t]he fourth type is the most general in which

---

[1] The United States Trustee also objected to confirmation on the basis that Debtors did not provide proof they are paying liquidation value to unsecured creditors. The Court will overrule that objection.

directors, professionals and others involved in the reorganization seek a release." Id. "These often occur but are rarely reported." Id.

"Courts generally apply contract principles in deciding whether a creditor [or equity holder] consents to a third-party release." In re SunEdison, Inc., 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) (bracketing added). "Consent may be express or *manifested by conduct*." Id. (emphasis added). "Courts generally agree that an affirmative vote to accept a plan that contains a third-party release constitutes an express consent to the release." Id. "Consent through silence or inaction [ ] raises a more difficult question." Id. Where consent is in question, applicable state contract law provides the most appropriate standard to determine consent, rather than theoretical "general" contract law that may or may not apply to the specific release at issue.

Under Florida law, applicable here by way of the choice-of-law provision, a "release is an outright cancellation or discharge of the entire obligation as to one or all of the [releasees]." Rosen v. Florida Ins. Guar. Ass'n, 802 So. 2d 291, 295 (Fla. 2001). A release "involves the fundamental tenets of contract law: offer and acceptance." Basner v. Bergdoll, 284 So. 3d 1122, 1124 (Fla. 1st DCA 2019). "An acceptance sufficient to create an enforceable agreement 'must be (1) absolute and unconditional; (2) identical with the terms of the offer; and (3) in the mode, at the place, and within the time expressly or impliedly stated within the offer.'" Id. "This ensures that there is a 'meeting of the minds' [or so-called 'mutuality of acceptance'] between the parties on all essential terms." Id. (bracketing added). In sum, so long as there is "offer and acceptance" under Florida law, the Third-Party Release is "consensual" for the purposes of confirming Debtors' Proposed Plan.

Here, the releases contained in the Proposed Plan are consensual because the Opt-Out Form meets the elements of acceptance under Florida law. The decision to return or not return the Opt-

Out Form is an absolute and unconditional acceptance or rejection of the offered release. The non-return of the form indicates acceptance of the terms offered, in the mode and manner prescribed in the Third-Party Release. Neither the U.S. Trustee nor the SEC has presented Florida case law to the contrary. Further, this mode and manner of acceptance essentially mimics the bankruptcy court's own negative-notice procedure. The Court is convinced the opt-out procedure employed here produces a consensual agreement and meeting of the minds between the releasees and releasors. However, this conclusion does not and shall not determine the enforceability of the Third-Party Release against each specific releasor. Rather, the Court determines the Third-Party Release is fundamentally consensual in nature. As a result, the Third-Party Release is not a basis on which the Court will sustain the objections to confirmation.

II.  **Assuming the Third-Party Release was nonconsensual, whether the Third-Party Release meets the Eleventh Circuit's <u>Dow Corning</u> factor test for nonconsensual bar orders / injunctions.**

The Third-Party Release is a consensual release; however, for purposes of completeness, the Court analyzes the Third-Party Release under the <u>Dow Corning</u> factors as prescribed by the Eleventh Circuit for considering nonconsensual bar orders. <u>SE Property Holdings, LLC v. In re Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)</u>, 780 F.3d 1070 (11th Cir. 2015).

    A.  **Enforceability of an approved consensual "release" versus a nonconsensual "bar order" injunction.**

The Eleventh Circuit used the terms "bar order" and "nonconsensual release" interchangeably. <u>Seaside</u>, 780 F.3d at 1076 n.2. However, under Florida law, if the release is not consensual, it is not a release at all. <u>See</u> 10 Fla. Jur 2d Compromise, Accord, and Release § 48 (Mar. 2021). Rather, a so-called nonconsensual release is, perhaps, more properly referred to as a

bar order or mandatory injunction.  Sec. & Exch. Comm'n v. Quiros, 966 F.3d 1195, 1199 (11th Cir. 2020).  This bears important implications regarding future enforceability.

If the bankruptcy court approves a consensual release at confirmation, the bankruptcy court may or may not determine the enforceability of the release as applied to specific parties and facts. But mere approval at the time of confirmation, standing alone, is not and cannot constitute a final determination that the release is enforceable as between all parties under all fact patterns.  Here, the number of Shareholders is too large and too diverse to determine the enforceability of the Third-Party Release as against every releasor.  The risk of unenforceability of the consensual release is borne by the releasees and plan proponents.

In contrast, the enforceability of a nonconsensual "bar order" is evident from the fact that it is a final order of the Court, entered pursuant to its statutory authority.  See generally Quiros, 966 F.3d at 1199 (discussing bar orders in the bankruptcy and receivership contexts).  Here, the Court's approval of the Third-Party Release is not to be construed as a bar order because the Third-Party Release is a consensual release.  Additionally, it fails to meet the Dow Corning factors.

**B.      The Dow Corning factor test.**

The Eleventh Circuit ascribes to the majority view that § 105(a) of the Bankruptcy Code permits nonconsensual bar orders (or injunctions) that bar claims of third-party non-debtors (e.g., the Shareholders) against other third-party non-debtors (e.g., Debtors' directors/officers, the Creditor's Committee, et cetera).  Seaside, 780 F.3d at 1078.  Issuing a nonconsensual bar order is a discretionary decision.  Id. at 1079.  However, "such bar orders ought not to be issued lightly and should be reserved for those unusual cases in which such an order is necessary for the success of the reorganization, and only in situations in which such an order is fair and equitable under all the facts and circumstances."  Id.  "The inquiry is fact intensive in the extreme."  Id.

The Eleventh Circuit adopted the seven-factor test from Dow Corning for considering whether to enter a nonconsensual bar order. Id. (discussing In re Dow Corning Corp., 280 F.3d 648, 658 (6th Cir. 2002)). "[B]ankruptcy courts should have discretion to determine which of the Dow Corning factors will be relevant in each case." Id. "The factors should be considered a nonexclusive list of considerations, and should be applied flexibly, always keeping in mind that such bar orders should be used 'cautiously and infrequently,' and only where essential, fair, and equitable." Id. (internal citations omitted).

The seven factors are as follows:

> (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;
>
> (2) The non-debtor has contributed substantial assets to the reorganization;
>
> (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor;
>
> (4) The impacted class, or classes, has overwhelmingly voted to accept the plan;
>
> (5) The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;
>
> (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full and;
>
> (7) The bankruptcy court made a record of specific factual findings that support its conclusions.

Id. The bar order affirmed in Seaside was an exculpation clause that limited liability for post-petition conduct connected to the bankruptcy case.

As to the first factor, Debtors have not presented evidence of contractual indemnification, yet Florida law provides for indemnification for Debtors' directors/officers (non-debtor releasees) in limited circumstances. § 607.0852, Fla. Stat. (2020); § 607.0854(1), Fla. Stat. (2020). Thus,

11

the relationship between the Debtors and Debtors' directors/officers is sufficient that this factor weighs in favor of entering a bar order. This is the only factor favoring a bar order.

As to the second factor, the directors/officers have not contributed "substantial assets" to any reorganization effort given that this is a liquidation case. This factor is generally inapplicable in a liquidation case. Further, even assuming this factor applies in a liquidation case, while the directors and officers have worked diligently in negotiating the Proposed Plan with the Creditor's Committee, those efforts do not constitute "substantial assets." Thus, the second factor does not support entry of a nonconsensual bar order.

As to the third factor, which is often a critical factor, this case does not involve a reorganization. It remains an open question as to whether nonconsensual bar orders even have a place in Chapter 11 liquidation cases. More to the point, the Debtors' ability to successfully liquidate their assets does not "hinge" on an injunction against the numerous claims enumerated in the Third-Party Release. Such an injunction is not absolutely necessary. Arguably, the injunctions may be critical to having the Class 6 unsecured creditors and Creditor's Committee voluntarily waive their own claims against the bankruptcy estate that would not otherwise be discharged pursuant to § 1141(d)(3)—which is discussed further, below. In other words, the parties have voluntarily negotiated releases between the unsecured creditors and the Debtors. Being essential to such voluntary negotiations is not what this factor contemplates. This factor contemplates involuntary injunctions rather than negotiated releases. Thus, the Court concludes this factor weighs neither for nor against the entry of a nonconsensual bar order enjoining the multitude of claims enumerated in the Third-Party Release.

As to the fourth factor, the impacted classes with voting rights have voted overwhelmingly in favor of the plan. However, the impacted class without voting rights (i.e., the Class 9

Shareholders) have not. This factor does not weigh in favor of entry of a bar order; though, neither does this factor weigh against entering such an order.

As to the fifth and sixth factors, these factors weigh directly against entering a nonconsensual bar order. The Proposed Plan provides no opportunity for the Class 6 unsecured creditors who opted out of the Third-Party Release to recover in full. The plan likewise fails to pay anything to the Class 9 Shareholders impacted by this release.

It appears the conceptual underpinning of nonconsensual bar orders expects the debtor to restructure and continue operations in some form. In the case of a liquidation, this conceptual underpinning is generally absent. As a result of this and the factor analysis above, the Court concludes it would be inappropriate to enter a nonconsensual bar order barring the broad class of claims enumerated in the Third-Party Release. As Debtors indicated in their brief, "Seaside and Munford are not directly applicable to the instant consensual third-party release because in this case anyone can opt out of the release." (Doc. 945 at 53).

**III.**   **Whether the Debtors' Release is supported by consideration.**

As to the Debtor's Release found in Article.VIII.C. of the Proposed Plan, the releasees are the "Released Parties" as that term is defined in the Proposed Plan, and the releasors are the Debtors. (Doc. 848 at 14, 45). Traditionally, it is the releasor's consent that matters, and the Debtors have clearly consented. However, the Debtors' Release is consensual on both sides. That is, parties in interest can opt out of being a releasee of the Debtors' Release simply by opting out of being a releasor in the Third-Party Release. Further, Debtors received consideration for giving this release in the form of receiving the releases via the Third-Party Release. The consideration is a release for a release. Further, this bargain is a sound business judgment on the part of the Debtors.

**IV.     Whether the nonconsensual Exculpation Clause meets the <u>Dow Corning</u> factors.**

The key difference between the Third-Party Release and the Exculpation Clause is that the Opt-Out Form only applies to the Third-Party Release and not the Exculpation Clause. There is no ability for a nonconsenting party to opt out of the Exculpation Clause. Thus, the Exculpation Clause is nonconsensual, and the <u>Dow Corning</u> factor test applies. <u>In re Seaside Eng'g & Surveying, Inc.</u>, 780 F.3d 1070, 1076 (11th Cir. 2015) (applying <u>Dow Corning</u> factor test to an exculpation clause that is more limited than the instant clause). The Exculpation Clause fails to meet the <u>Dow Corning</u> factor test for the same reasons discussed above concerning the Third-Party Release.

Further, the Exculpation Clause abdicates liability on essentially all types of claims except actual fraud. This narrow exception to the Exculpation Clause goes a step too far to be entered as a nonconsensual bar order. <u>See, e.g.</u>, <u>Seaside</u>, 780 F.3d at 1076 (excepting fraud, gross negligence, and willful misconduct); <u>In re Winn-Dixie Stores, Inc.</u>, 356 B.R. 239, 261 (Bankr. M.D. Fla. 2006 (excepting fraud, gross negligence, and willful misconduct); <u>In re Enron Corp.</u>, 326 B.R. 497, 501 (S.D.N.Y. 2005) (excepting gross negligence, willful misconduct, and fraud); <u>Murphy v. Weathers</u>, 2008 WL 4426080, at *5 (M.D. Ga. Sept. 25, 2008) (excepting fraud, gross negligence, willful misconduct, and breach of fiduciary duty). The Exculpation Clause is the sole basis upon which the Court will sustain the objections to confirmation.

**V.     Whether the Court retains authority to approve the Third-Party Release and whether the release impermissibly grants Debtors or non-debtor individuals a discharge they would not otherwise be entitled to, pursuant to § 1141(d)(3) and § 523(a), respectively.**

Section 523(a) generally enumerates various exceptions to discharge that apply to "individual" debtors. 11 U.S.C. § 523(a) (2020). Section 1141(d)(3) provides that the confirmation of a Chapter 11 plan "does not discharge a debtor if-- (A) the plan provides for the liquidation of all or substantially all of the property of the estate; (B) the debtor does not engage

in business after consummation of the plan; and (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title." 11 U.S.C. § 1141(d)(3) (2020); see also In re TOUSA, Inc., 503 B.R. 499, 505 n.4 (Bankr. S.D. Fla. 2014) ("TOUSA's Chapter 11 plan is a liquidating plan and no discharge of debt results in a liquidation under 11 U.S.C. § 1141(d)(3).").

Here, Debtors are not entitled to a discharge pursuant to § 1141(d)(3) in light of the Proposed Plan. Further, the Third-Party Release releases claims against non-debtor individuals that would be excepted from discharge under § 523(a). However, nothing in § 1141(d)(3) or § 523(a) prevents Debtors or the non-debtor individuals from negotiating voluntary consensual releases with creditors. This result is reasonable in light of the fact that the Creditor's Committee negotiated and received $2.8 million for unsecured creditors in exchange for voluntarily releasing claims against the Debtors that would not be discharged under § 1141(d)(3). Nothing in Title 11 precludes this voluntary outcome under these circumstances. However, this leads into the U.S. Trustee's and SEC's final argument concerning whether the Shareholders received consideration in exchange for the releases granted by them in the Third-Party Release.

**VI.   Whether Shareholders received consideration in exchange for granting the Third-Party Release.**

The U.S. Trustee and SEC contend the Third-Party Release should not be approved because the Shareholders have received nothing in exchange for the releases they voluntarily granted by choosing not to opt-out of the Third-Party Release. It is correct that, under Florida law, an enforceable release requires the releasor to receive some valuable or adequate consideration before the release may be enforceable against that releasor. Lakes of Meadow Vill. Homes v. Arvida/JMB Partners, L.P., 714 So. 2d 1120, 1123 (Fla. 3d DCA 1998) (holding that genuine issues of fact existed as to whether ten dollars was adequate consideration in exchange for release); Hamilton v.

United Ins. Co. of Am., 428 So. 2d 346, 347 (Fla. 1st DCA 1983) (holding that sufficient consideration supported the releases); Atl. Coast Line R. Co. v. Beazley, 45 So. 761, 785 (Fla. 1907) (discussing sufficiency of consideration for a release and stating, "While it is always pleasant to 'walk in the light' of authority and to keep company with our judicial brothers in the different courts whenever it is possible to do so, it is still more desirable to feel that in our conclusions we are supported by the reason of the law, even if in so doing we should have to stand alone.").

Here, the Court is unaware of what consideration any particular Shareholder may or may not have received although it is clear the unsecured creditors received valuable consideration (i.e., the $2.8 million) in exchange for the releases granted by them in the Third-Party Release. Nevertheless, enforceability of the Third-Party Release as to any specific non-debtor releasor is not an element for confirmation of the Proposed Plan and determining enforceability as to every Shareholder is inappropriate. 11 U.S.C. § 1129 (2020). If the Third-Party Release turns out not to be enforceable as to a specific releasor concerning a specific claim against a specific releasee, the risk of such an occurrence falls on the releasee(s)—i.e., the Debtors, Debtors' directors and officers, the Creditor's Committee, the plan administrator, and/or other proponents of the Proposed Plan. The proponents of the plan, being sophisticated parties represented by counsel, certainly took this risk into consideration. Taking on such risk is a sound business judgment under the totality of the circumstances.

The objectors further contend the Injunction found in Article VIII.F. of the Proposed Plan prevents Shareholders from even bringing suit. First, the U.S. Trustee and SEC have not presented the barest hint of any meritorious Shareholder claims. Second, if a purported releasor magically discovers a non-frivolous, meritorious claim after confirmation and brings suit against a purported

releasee, the plaintiff-releasor may plead failure of consideration in the complaint. A different course is for the defendant-releasee to raise the release as an affirmative defense followed by the plaintiff-releasor's reply. Again, the Court makes no determination as to the enforceability of the Third-Party Release against any specific non-debtor releasor; such matters could not and should not be raised here and now.

## Conclusion

The Third-Party Release is consensual under Florida law, and nothing in § 1141(d)(3) or § 523(a) prevents Debtors or other non-debtor individuals from negotiating voluntary consensual releases with creditors. The Court will approve it. However, if it were nonconsensual, the Court would not approve it because it does not meet the Dow Corning factor test for nonconsensual bar orders/injunctions. The Debtors' release is supported by consideration. The Court will approve it. The Exculpation Clause is nonconsensual and does not meet the Dow Corning factor test. The Court will not approve it. The Court will enter a separate order overruling the U.S. Securities and Exchange Commission's Objection to Confirmation, sustaining in part and overruling in part the United States Trustee's Objection to Confirmation, and denying confirmation of the Debtors' Combined Plan of Liquidation.